STATE OF LOUISIANA     *     NO. 2024-KA-0509

VERSUS     *

KENNETH COLLINS     *

COURT OF APPEAL

FOURTH CIRCUIT

    *

STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-641, SECTION "E"
Judge Rhonda Goode-Douglas
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*

(Court composed of Judge Rachael D. Johnson, Judge Karen K. Herman, Judge Nakisha Ervin-Knott)

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
Zachary M. Phillips, Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

     COUNSEL FOR DEFENDANT/APPELLANT

                     **AFFIRMED**
                     **JUNE 18, 2025**

Kenneth Collins ("defendant") seeks review of his conviction for second degree murder.  For the reasons that follow, we affirm the conviction.

## FACTUAL AND PROCEDURAL HISTORY

On June 16, 2022, the State filed an indictment charging defendant with the second degree murder of Frank Mehrhoff (hereinafter, "the victim"), a violation of La. R.S. 14:30.1. Defendant appeared for arraignment on June 23, 2022, and entered a plea of not guilty. On July 7, 2022, defendant filed an omnibus motion for, *inter alia,* suppression of statements, which the district court denied following a hearing on January 20, 2023. Defendant filed a motion *in limine* on December 4, 2023, to exclude hearsay and witness narration of video evidence, which the district court denied following a hearing on January 24, 2024.

On January 12, 2024, defendant filed notice of his intention to use the expert witness testimony of Dr. Sarah Deland ("Dr. Deland"), and on January 19, 2024, the State filed a motion to exclude evidence of mental disease or defect. Defendant filed a supplemental notice of his intent to present expert testimony on January 26, 2024, and the court denied the motion following a hearing on the same day. Defendant sought a writ, which was denied by both this Court and the Supreme

1

Court. *See State v. Collins*, 2024-0054 (La. App. 4 Cir. 2/1/24), *writ denied* 2024-00167 (La. 2/3/24), 378 So.3d 746.

Jury selection began on February 5, 2024, and the case proceeded to trial the following day. On February 8, 2024, the jury returned a unanimous verdict of guilty as charged. Defendant filed motions for post-verdict judgment of acquittal and for a new trial on March 11, 2024; the district court heard arguments the same day and subsequently denied both motions. Defendant appeared for sentencing on April 24, 2024, and following testimony from members of defendant's family, the district court imposed the mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant filed a motion to reconsider sentence the same day, which the district court denied. This timely appeal followed.

**ERRORS PATENT REVIEW**

In accordance with La. C.Cr.P. art. 920, we review all appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2).

A review of the record reveals that the indictment bearing the signature of the grand jury foreperson is absent from the record. La. C.Cr.P. art. 382(A) provides in pertinent part that "an offense punishable by … life imprisonment, shall be instituted by indictment by a grand jury." Pursuant to La. C.Cr.P. art. 383, the indictment must be "returned into the district court in open court . . . ." Nevertheless, this Court has held that the absence in the record of the signed indictment is a harmless error where the record otherwise reflects that a true bill was returned, and where the grand jury return of indictments reflects that the

2

indictment was signed by the grand jury foreperson. *State v. Hawkins*, 2016-0458, p. 13 (La. App. 4 Cir. 5/17/17), 219 So.3d 1133, 1141; *State v. Chambers*, 2016-0712, p. 6 (La. App. 4 Cir. 2/15/17), 212 So.3d 643, 647-48.  This Court has also held that "the failure of a defendant to object to alleged deficiencies in an indictment and the failure of a defendant to file a motion to quash the indictment on that basis waives those errors." *Hawkins*, 2016-0458, p. 13, 219 So.3d at 1141 (citing *State v. Porche*, 2000-1391, p. 5 (La. App. 4 Cir. 2/14/01), 780 So.2d 1152, 1155).  Here, defendant did not lodge any objections on the basis of a deficient indictment, nor did he file a motion to quash the indictment.

The docket master reflects that the State filed an indictment, noted as a "true bill," on June 16, 2022, and the court minutes indicate that the "bill of indictment" was read during defendant's arraignment on June 23, 2022. The list of Grand Jury Return of Indictments contained in the record includes the charge against defendant and reflects that it was signed by the grand jury foreperson. Accordingly, the absence in the record of the signed indictment is harmless in these circumstances.

## SUMMARY OF TRIAL TESTIMONY AND EVIDENCE

### *State's Case*

The State called Erika Darby ("Ms. Darby"), who testified that on February 18, 2022, she was employed as the Custodian of Records for the Orleans Parish Communications District, and she authenticated the 911 phone calls and incident recall report associated with the instant case. The State introduced the audio recording of the 911 phone calls and played them in open court.  A review of the 911 calls reflects four separate callers reporting a motionless man who appeared

homeless, with a pool of blood underneath him, at a bus stop on the corner of Banks and Broad Streets.

NOPD Homicide Detective Tanesha Sykes-Smith ("Det. Smith") testified that she was the lead investigator in the case after initially receiving information that the victim in this case was found dead at the intersection of Banks and Broad Streets from what was believed to be a gunshot to the head. However, following the autopsy, Det. Smith learned that the victim had not been shot. The State introduced a series of still frame photographs taken from the police-worn body camera footage of Officer Ryne Schuler, the first officer to arrive at the scene, and published the photographs to the jury.

Det. Smith described the crime scene as reflected in the photos, stating,

> The victim is lying under the bus stop. All of the stuff to the left of the screen at the bottom is the victim's belongings. And there's blood coming from underneath the basket, and the victim is lying where that red object— where that red sleeping bag is. He is positioned up there.

She testified further, "You can see the victim's feet are hanging off of the bench. He was lying across the bench and he, I guess, his body kind of slid off the bottom of it, I assume." Det. Smith also stated that the victim's back was "facing Broad Street," while his "feet pointed towards the back of the bus stop," and that the sleeping bag was "draped over" the victim's legs.[1] As Det. Smith described additional crime scene photographs, she noted that the victim appeared to have "a large gash to the back of his head [, and] his hands appear to be in front of his

---

[1] The State introduced the crime scene photographs taken by the crime scene technician and published them to the jury while Det. Smith described them. A review of the photographs corroborates Det. Smith's description thereof.

face…also he had a cap that's partially off of his head." She also noted that the victim had "blood on his hands and on his jacket or shirt."

Det. Smith testified that she located several surveillance video cameras that captured the incident and that she recovered footage from a Real-Time Crime camera at the intersection of Banks and Broad Streets; a gas station across the street called Broad Street Meat Market ("Market");[2] and "a business that was directly behind the bus stop." The State introduced the surveillance footage and played it in open court while Det. Smith narrated the events depicted thereon. Det. Smith's testified that the Real-Time Crime camera footage reflected defendant walking down Broad Street at 9:52 p.m. and entering the Market, and then heading toward the bus stop at the intersection of Banks and Broad Streets. Det. Smith testified that she was able to identify defendant in the surveillance video because additional surveillance footage taken from both the interior and exterior of the Market during the corresponding timeframe provided a clear view of defendant's face and clothing.

Det. Smith pointed out defendant in the video, as he was wearing the same clothes he was observed wearing in the footage from the Market, and she noted that he walked from the Market towards the bus stop at the intersection of Banks and Broad Streets, engaged in a struggle with someone at the bus stop, and then ran away.[3] Shortly thereafter, the footage reflected that defendant returned to the area

---

[2] Det. Smith referred to the Market later in her testimony as the Banks Street Market as well.

[3] Specifically, Det. Smith testified, "We saw a struggle taking place up at the bus stop. And we see the subject who we saw from the store who had the heavy coat on and the hat in all black clothing running this way from the bus stop." A review of the surveillance footage corroborates Det. Smith's testimony. We note from the footage that defendant repeatedly peeked around the bus stop shelter before entering. Once defendant emerged from the bus stop shelter, he appeared to be engaging in a tug-of-war with the victim over a fabric item before letting go of it and immediately fleeing the location.

and sat down on the front steps of a law office with an unobstructed view to the bus stop directly across the street. According to Det. Smith's description of the surveillance footage, around 10:15 p.m. once all of the pedestrians had departed the area, defendant "looked over his shoulder" as he approached the bus stop, then picked up an object located at the bus stop, and swung it one time. Det. Smith stated, "[It] looked like he picked something up and did like that (apparently motioning) toward his—like his foot went off the ground."[4] She also stated that it did not appear that defendant was fighting anyone, or "wrestling over an object," nor did it appear that he "in any way disarm[ed] anyone." The footage then shows defendant walking away from the bus stop holding a baseball bat. Det. Smith testified that the first 911 call regarding the death of the victim was received at 7:55 a.m. the following morning.

Det. Smith testified that after viewing the surveillance footage at the outset of her investigation, she "was able to take a still image from the video surveillance at the Market and make a BOLO [be on the look-out bulletin] from that photograph."[5] A few days after distributing the bulletin to media outlets, Det. Smith was notified that defendant wanted to come into the station to talk after a family member saw his picture on the news. Prior to the interview of defendant,

---

[4] We note that the footage depicts defendant crossing the street toward the bus stop, and he appears to be holding his jacket with both hands (as if he is concealing an object inside). Notwithstanding Det. Smith's testimony that it appeared to her that defendant picked up the bat from the victim's cart inside the bus stop shelter, the way defendant appears to hold his jacket firmly against his body with both hands as he crossed the street could also support the view that he brought the baseball bat to the scene with him and was concealing it inside his coat. Defendant then entered the bus stop shelter and, only seconds later, lifted the bat directly over his head and swung it straight downward.

[5] Det. Smith testified that she interviewed a suspect matching the description of the perpetrator named Jeffrey Langston, and although he admitted that he knew the victim, he denied that he was involved and denied knowing the person in the BOLO photograph. Det. Smith stated that Mr. Langston "didn't look anything like the person in the BOLO," and she was able to eliminate him as a suspect.

which occurred on March 11, 2022, at 8:00 am, Det. Smith issued *Miranda* warnings. Defendant stated that he did not need an attorney. Det. Smith testified that defendant did not appear intoxicated "at all," nor did he slur his speech or have difficulty remembering events. Defendant's audio and video recorded statement was introduced into evidence and played for the jury.

A review of defendant's police interview reflects that defendant repeatedly denied any violent interaction with the victim, despite Det. Smith's continuous reminders that the incident was recorded by nearby surveillance cameras. Defendant initially stated that he went to the Market on the corner of Banks and Broad Streets on the night of the offense and then returned home, specifically denying that he had been in any altercation. Once Det. Smith informed defendant that surveillance cameras captured an altercation between him and a homeless man at the bus stop across the street, defendant admitted that he argued with the victim, stating that the victim told him to get away, hitting with a pipe. Defendant claimed that he grabbed the pipe from the victim and threw it on the ground, then went home. Det. Smith reminded defendant that the incident was captured on surveillance, but defendant maintained his version of events. Another officer present during the interview asked defendant whether he had been injured by the pipe, and defendant stated that he had not actually been hit because he was able to block the strike with his arm.

After agreeing with Det. Smith that he did return to the intersection and sat across the street for several minutes, defendant stated that he was concerned that nearby individuals were "messing" with the victim and he wanted to observe the situation; he stated that he approached the bus stop to "check on" the victim. Although partially inaudible, defendant appeared to suggest that he left the area

and went home after learning that one of the individuals near the bus stop was armed with a firearm. Defendant explained that his granddaughter told him the following day that someone in the area had been shot, although he did not know the identity of the victim until several days later. Defendant told Det. Smith that he spent several days trying to figure out who shot the victim, and maintained that he left the scene after the victim asked him to "get away."

Det. Smith informed defendant that the victim had not been shot, and another officer suggested the possibility that the victim was killed in self-defense. Defendant denied removing any items from the victim's cart, and expressed his certainty that he neither swung the pipe nor hit the victim at any time. Defendant maintained that he left the area at the victim's request despite Det. Smith repeatedly informing him that his assertions were not supported by the surveillance footage. Eventually, defendant told the detectives that he "took and grabbed the pipe and [he] hit him with it," and then went home. Defendant recalled hitting the victim "once," either "in the arm, neck, or head, or something like that." Defendant denied that the victim was lying down when he hit him, stating that "he stood up; he did stand up."

Det. Smith testified that she interviewed defendant for a total of twenty to thirty minutes, during which time he provided his home address. A warrant was obtained and a search of defendant's residence was conducted. During the search, Det. Smith located "the oversized tan jacket that [she] observed the subject wearing on the day of the incident," and a baseball bat with blood on it leaning against the wall. Det. Smith also seized a pair of shoes, a pair of gloves that "appeared to have some blood on it," and a skull cap similar to that worn at the

time of the offense. [6] Det. Smith sent the baseball bat to the crime lab to conduct DNA testing and procured for a warrant for defendant's arrest.

On cross-examination, Det. Smith testified that she collected samples of the victim's blood from where it had pooled underneath the bench on which the victim had been lying, and from the sidewalk directly behind the bench, but the samples were not sent to the crime lab for DNA testing.[7] Det. Smith also testified that the bench on which the victim was found was built in such a way to prevent people from lying down. Accordingly, Det. Smith denied that the victim was found lying stretched out down the length of the bench, but was "partially leaned over" the bench, with his feet "hanging off the side." Det. Smith agreed that the bus shelter/enclosure surrounding the bus stop was covered in advertisements, but she stated that its interior was visible through the "holes" in the wall (resembling mesh), and through the backside of the shelter where the view was unobstructed.[8] Det. Smith testified that the victim's shopping cart containing his belongings was located near the victim inside the bus stop enclosure, although she did not collect it as evidence or inventory the items in the cart; rather, it was removed and disposed of by the Department of Sanitation shortly after Det. Smith arrived at the scene.

---

[6] The State introduced police-worn body camera footage of the search of defendant's residence and photographs of defendant's residence. The evidence was published to the jury. A review of the body camera footage and the photographs of the search of defendant's residence corroborates Det. Smith's descriptions thereof.

[7] Det. Smith explained that detectives were not permitted to send more than three or four items to the crime lab at a time for forensic testing per case, and other items were apparently a higher priority than the victim's blood samples.

[8] Det. Smith agreed that she was unable to see the inside of the shelter from the angle of the surveillance camera.

Det. Smith testified that the surveillance footage depicted defendant and the victim engage in an initial physical altercation, after which defendant fled the scene. He later returned and appeared to strike the victim in the head.

Det. Smith testified that during the interview, defendant admitted that he was the person in the BOLO bulletin.[9] She stated she did not ask defendant whether he was intoxicated or whether he required any medication prior to taking his statement. Det. Smith testified that at some point during the interview, defendant "held up his arms to indicate that he was defending himself…blocking swings from a pipe." Defendant also indicated that he knew the victim and wanted to know who shot him. Defendant told Det. Smith that he had tried to help the victim and had brought him food and water on occasion, and that he was concerned because the victim "was not acting like himself that night," and "that he came back to check on him."

Defendant played a clip from the previously introduced surveillance footage, which Det. Smith agreed depicted defendant walking toward the bus stop. Det. Smith testified that she could not "see anything going on" at the bus stop at that time because there was no movement at that time.[10] Det. Smith testified that the footage reflected defendant and the victim engaging in "a tussle" after which defendant fled the area; she agreed that the victim appeared to be holding an object in his hand, although Det. Smith could not identify the object or determine its size. She testified that when defendant returned to the area later that night and sat down on the front steps of the office across from the bus stop, he did not "appear to have

---

[9] Det. Smith testified that defendant signed and dated the photograph of himself.

[10] Det. Smith clarified that defendant and the victim were standing outside of the bus enclosure, opposite from the location of the surveillance cameras.

anything in his hands," nor did he later appear to make any effort to conceal the baseball bat he removed from the scene after the final altercation.

On redirect examination, Det. Smith confirmed that she did not locate a metal pipe throughout her investigation, nor did any of the crime scene photos or the surveillance footage reflect the presence of a pipe at any time. Det. Smith testified that the surveillance footage did not reflect a struggle or a fight between defendant and the victim when defendant returned to the bus stop and killed him, nor did it depict defendant bringing the victim any food or water.

Det. Smith also explained that prior to interviewing defendant, he did not smell like any intoxicating substances, "he didn't appear to have any trouble walking," and he had called the police department around 7:00 a.m. to schedule the interview; defendant did not appear intoxicated and Det. Smith had no reason to suspect that he was not sober. She also explained that it was common for a suspect waiting alone in an interrogation room "to take a nap during long periods of break," which was neither an indication of intoxication, nor that the statement was provided involuntarily.

Angela Maher ("Ms. Maher"), Louisiana State Police Crime Lab Analyst, was qualified by the district court as an expert in DNA analysis after stipulation as such by defendant. She testified that she conducted the DNA tests and authored the DNA analysis report in this case. Ms. Maher testified that she tested a suspected spot of blood taken from the baseball bat seized from defendant's residence, as well as a swab from the handle, and compared them to DNA samples taken from defendant and the victim. She testified that the blood sample was consistent with the DNA profile of the victim, while the DNA sample taken from the handle of the bat was inconclusive as to the victim. She testified further that

defendant "was not excluded" as a contributor to the DNA located on the handle of the bat.[11]

On cross-examination, Ms. Maher testified that another technician in the crime lab had "screened" a pair of black and white sneakers associated with this case, although she personally did not conduct DNA testing thereon.

Dr. Marianna Sandomirsky ("Dr. Sandomirsky"), a forensic pathologist at the Orleans Parish Coroner's Office, was qualified by the district court as an expert in forensic pathology after stipulation as such by defendant. She testified that she conducted the victim's autopsy and authored the autopsy report in the instant case.[12] Dr. Sandomirsky testified that the victim died as a result of "multiple blunt-force injuries of the head." She continued:

> There's fractures, multiple skull fractures, and those bones cut up the brain so there's cerebrum fracture lacerations and contusions, meaning bruises. There's blood around the brain in different layers, and the brain is swollen. So those are the things that led to the death. And then [] there's listings of additional things that could have contributed to his death such as heart disease, some fatty liver, emphysema, but those weren't the reason for his death in this particular date.

Specifically, Dr. Sandomirsky testified that the victim suffered three lacerations to the "back of the left side of the head," and "there were multiple skull fractures underneath." She explained further that "the majority of the skull fractures are in the back. They're more complex on the left side, but they also

---

[11] Ms. Maher testified that the probability of another person matching the DNA profile as that taken from the handle of the bat was 53.4 thousand in the Caucasian population, 5.2 thousand among the African American population, and 27.5 thousand among the Hispanic population. However, an additional "non-contributor stat" test concluded that of 15.2 thousand others who may match the DNA sample, "only one in 14.3 million people would match as strongly."

[12] The State introduced the autopsy photographs. A review of the photographs of defendant's autopsy corroborates Dr. Sandomirsky's testimony.

extend to the right side, so the majority of this injury is in the back." Dr. Sandomirsky described the extent of the bleeding in the victim's brain as "a non-survivable injury."

On cross-examination, Dr. Sandomirsky testified that an investigator from the coroner's office was dispatched to the scene on February 18, 2022 at 8:59 a.m. to obtain information from law enforcement officers and determine whether an autopsy was warranted. She agreed that the "investigator's narrative" reflected that "the decedent was lying on a bus stop bench with a pool of blood underneath," with "multiple GSW (gunshot wounds) to the back of the head," although she was "not sure where that information came from." Dr. Sandomirsky also testified that the victim's injuries suggested "at least three impacts," and that it was "very unlikely" that the wounds resulted from only one blow. She agreed that the victim showed "discoloration on the knuckles of the left hand," although "due to the fact that this was winter and his skin tone, it was unclear whether these were bruises, aka, injuries, or just something else." Dr. Sandomirsky also noted that the toxicology report indicated no presence of alcohol in the victim's blood.

The State re-called Det. Smith to the stand, and she testified that she reviewed the recorded jail calls defendant placed the day he was arrested on March 11, 2022, and that he did not refer to the victim as his friend or his "partner," but as "that [n-word]." He also stated in the phone call that "he should have stayed home," but that the Devil made him go back, further stating, "I did it to myself." The State played defendant's jail call for the jury.

**Defense's Case**

Courtney Hebert ("Ms. Hebert") testified that she was employed as the Quality Assurance Manager" at the Louisiana State Police Crime Lab and that she

was occasionally dispatched to crime scenes, as she was in the instant case. She testified that she arrived at the scene on the morning of February 18, 2022 to make a sketch of the crime scene. Ms. Hebert noted that her sketch depicted "possible blood the ground," and she denied having any other responsibilities in this case. The sketches were introduced into evidence.

Dr. Jonathan Eisenstat ("Dr. Eisenstat") a consultant in the field of forensic pathology, was qualified by the district court as an expert in forensic pathology and injury causation. Dr. Eisenstat testified that the victim sustained three lacerations to his head and multiple skull fractures, but denied that the injuries were a result of three separate impacts. He explained that the big laceration seen in the photographs was from the blow but that the two lacerations that are lower on the head were from the skull breaking and cutting the skin from the inside out. Dr. Eisenstat also noted the absence of bruising or abrasion in the area of the two lower lacerations that were present in the larger laceration, as well as the small amount of blood on the baseball bat seized from defendant's residence, which he stated would be soaked in blood if it had contacted the victim's head a second time after the initial laceration. As a result, Dr. Eisenstat opined that the victim's injuries were caused by only "one blow, not three blows to the head." He also suggested that it was plausible that the victim was standing up when he was struck in the head, as the position of the victim's body reflected in the crime scene photographs was in his opinion, "not a normal sleeping position."

On cross-examination, Dr. Eisenstat admitted that he could not say precisely how the victim's injuries were sustained, and he could only opine on possibilities.

NOPD Sergeant Willie Jenkins ("Sgt. Jenkins") testified he responded to the scene in this case in his supervisory capacity and did not conduct any part of the

14

substantive investigation. He acknowledged that he was wearing a body camera at the time, and after refreshing his recollection, he agreed that he had observed at the scene droplets of what appeared to be blood a few feet away from the bus stop bench, which "looked as though it was part of the incident but not from the [victim]." Sgt. Jenkins testified that he did not know whether a sample of that blood was collected from the scene.

On cross-examination, Sgt. Jenkins testified that he was not the lead detective in the instant case; he was not responsible for the collection of evidence; and he did not know whether the substance of the droplets located nearby was, in fact, blood.

Defendant testified at trial that he had multiple criminal convictions across several Louisiana parishes, and he pled guilty in each of those cases because he was guilty. However, he stated that in this case, he did not plead guilty, explaining, "Because I ain't try to kill nobody. All I did was defend myself."

Defendant testified that he was homeless in 2016 and was staying under the "Claiborne Bridge," where he befriended the victim, who was also homeless. Defendant stated that he did not know the victim's name so he just called him "partner." Defendant testified that after the Housing Authority provided him with a home, he did not see the victim for a while. In November of 2021, defendant saw the victim again on the street and brought him a meal. Defendant testified that he saw the victim often, and they would drink and play checkers.

Defendant testified that he saw the victim again in February of 2022. At that time, he stated that the victim did not recognize him and told him to get away. Defendant testified that he told the victim, "Partner, it's me, partner," but the victim hit defendant in the arm with a pipe, allegedly causing defendant to bleed.

15

Defendant explained that they began fighting over the pipe while he tried to reason with the victim, but when the victim gained control of the pipe, he "immediately went to swinging it again," so defendant fled.

Defendant stated that he ran home and told his housemate what happened, and she advised him to leave the victim alone. Defendant explained that he returned to the area out of concern for the victim's safety, but he decided to sit across the street from the bus stop "to see if anybody was messing with him…and wait to see if he done cooled down before I go back over there." Defendant testified that he could see the victim sitting down, wearing "like a blue sheet or towel or something." Defendant walked across the street and approached the victim, asking if he was alright, and the victim told him to get away. Defendant continued, "[The victim] got up and he started swinging the pipe; so, when he hit me…I grabbed the bat and swung the bat…trying to knock the pipe out of his hand." However, defendant explained that rather than hit the pipe, he hit the victim. The victim then "went down," while continuing to plead with defendant to "get away." Defendant further stated that he took the pipe from the victim and placed it inside his basket, then "put the bat on [his] shoulder and said, "All right; I'll see you in the morning,'" and went home. Defendant testified that he returned the pipe to the victim's basket because he did not want to hurt anyone. He stated that he took the bat with him when he left so he would feel safe going home. Defendant testified that he was not worried about the victim when he left the bus stop, nor did he think that the victim needed help. He also declined to seek medical attention for the victim after the initial assault with the pipe because he "didn't know if he was drunk or high or what," and he did not report the assault.

Defendant testified that his housemate's granddaughter and her boyfriend came over early the next morning saying that a homeless man was found shot to death at the corner of Banks and Broad Streets. Defendant's suspicions that the victim was the deceased homeless man were confirmed when he saw that the bus stop where he had left the victim was blocked off. Defendant learned that he was a suspect in the case around March 9th or 10th, when his granddaughter showed him his picture on her phone under the headline reporting the victim's death. Defendant testified that he did not shoot the victim, so he telephoned the police department to find out why he was a suspect. Defendant testified that after informing Det. Smith that he would come to the police station, he took some pain medication and drank "a little liquor" with his breakfast, as he usually did. Defendant also stated that he called his parole officer after learning he was a suspect, and his parole officer advised him to get a lawyer and turn himself in. Defendant declined to obtain counsel. He stated he was not worried because he did not shoot the victim.

Defendant testified that Det. Smith administered *Miranda* warnings before the interview, but he nonetheless assumed that he was free to leave at any time because he did not "shoot" anyone. After Det. Smith informed defendant that the victim died from head trauma and that she suspected defendant was responsible, defendant told her that the victim hit him in the eye with a pipe and that he threw his arm up to defend himself.

Defendant further testified that he set the baseball bat beside his dresser inside his residence; made no effort to wash either the bat or the clothing he had been wearing; and provided his home address to Det. Smith during the interview. He also stated that Det. Smith did not ask him before the interview whether he had consumed drugs or alcohol. Defendant testified that he first learned that he was

17

allegedly responsible for killing the victim when Det. Smith told him the victim died from head trauma rather than a gunshot wound. Defendant explained at trial that he felt "really bad" when he realized he had killed his friend, stating, "I know me and him had a little scuffle, and I swing the bat to try to knock the pipe out of his hands from hitting me. And I knew I hit him, but I didn't know I hit him in the head." Defendant denied that he was trying to hurt the victim when he hit him with the bat, and he had no idea the victim was dying. When asked how he felt after learning he killed the victim, defendant responded, "I didn't feel good at all. I started drinking heavy; walking around; I was lost."[13]

On cross-examination, defendant agreed that getting hit with a baseball bat in the head would hurt, but he did not know whether it could be lethal. Defendant maintained his trial testimony that after he hit the victim with the bat, the victim told him to "get away," notwithstanding Dr. Eisenstat's testimony that that the victim would have been unable to form coherent words following such a serious head injury.

### State's Rebuttal

On rebuttal, the State recalled Det. Smith to the stand, and she explained that when she interviews criminal suspects, she does not showcase the evidence she has collected at the outset because she does not want to give them the opportunity to alter their story fit with the evidence. Det. Smith testified that defendant did not admit that he hit the victim with a bat until she told him that surveillance cameras recorded the incident. She also confirmed that she did not locate a metal pipe in the

---

[13] Defendant later explained that what he meant to communicate was that he started drinking heavily once he learned that the victim had died, but he did not learn he could have been responsible for the victim's death until his police interview.

victim's cart or anywhere else. On cross-examination, Det. Smith admitted that when she searched the victim's belongings, she thought he died from a gunshot wound, and she was searching for ballistics evidence. She also admitted that she did not document the inventory of the victim's cart, nor did she log the items into evidence; however, she recalled that the cart contained "personal items, like clothing, socks, and you know, different things that he probably acquired over some time."

## DISCUSSION

### *Assignment of Error Number 1*

Defendant first asserts that the State presented insufficient evidence to sustain the conviction. Specifically, defendant argues that the State failed to prove that he possessed the specific intent to kill the victim or cause great bodily harm and that the State also failed to prove that defendant did not kill the victim in self-defense.

"[I]n accordance with the well-settled jurisprudence, '[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.'" *State v. Miner*, 2014-0939, p. 5 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 135 (quoting *State v. Hearold*, 603 So.2d 731, 734 (La.1992)).

The Supreme Court provided the standard for review of a claim of insufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979):

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This

familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Id*. (emphasis in original, internal citations omitted).

"Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 2011-0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771 (quoting *State v. Jones*, 2011-0649, p. 3 (La. App. 10/19/11), 76 So.3d 608,611).

As this Court found in *State v. Wells*, 2010-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306:

Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. *State v. Jones*, 537 So.2d 1244 (La. App. 4 Cir. 1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *Id.* A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. *State v. Vessell*, 450 So.2d 938 (La. 1984).

"The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id*. (citing *State v. White*, 28,095 (La. App. 2 Cir. 5/8/96), 674 So.2d 1018). The finder of fact must determine, from facts gleaned from direct evidence and inferred from circumstantial evidence, considering the relative strength and weakness of each inference and finding, whether this body of preliminary facts excludes every reasonable hypothesis of innocence. *State v. Dukes*, 2019-0172, p. 9 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 753; *State v. Rose*, 2005-0396, p. 2 (La. App. 4 Cir. 4/13/07), 955 So.2d 270, 272.

20

It is also well settled that "[i]t is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Richards*, 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citing *State v. Cummings*, 668 So.2d 1132 (La. 1996)). "Upon review of the record as a whole, if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence must be adopted." *State v. Bradley*, 2018-0734, p. 4 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 97 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)).

La. R.S. 14:30.1 provides that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. "Specific criminal intent is the state of mind which exists when circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). "Specific intent can be formed in an instant." *State v. Cooks*, 2011-0342, p. 10 (La. App. 4 Cir. 12/14/11), 81 So.3d 932, 939 (citing *State v. Cousan*, 1994-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390). Specific intent need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant. *State v. Hickman*, 2015-0817, p. 11 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1167 (abrogated on other grounds by *State v Donovan*, 2019-0722 (La. App. 4 Cir. 5/27/20), 301 So.3d 541). It can further "be inferred from the extent and severity of the victim's injuries, and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death." *State v. Butler*, 2024-0061, p. 12 (La. App. 4 Cir. 12/30/24), 407 So.3d 744, 750 (citing *State v. Jackson*, 54,118, p. 5 (La. App. 2 Cir. 11/17/21), 334 So.3d 874, 878-79). Whether the requisite intent is present in a criminal case is determined by fact finder, and this determination is

reviewed for correctness under the *Jackson* standard. *State v. Sipp*, 2011-1555, p. 6 (La. App. 4 Cir. 11/28/12), 104 So.3d 648, 653 (citing *State v. Huizar*, 414 So.2d 741, 751 (La. 1982)). "[A]n attack in which a victim is bludgeoned to death with a baseball bat is sufficient to demonstrate the necessary specific intent to kill or inflict great bodily harm for second degree murder." *State v. Guice*, 26,440, p. 7 (La. App. 2 Cir. 10/26/94), 645 So.2d 1193, 1197; *See also State v. Scott*, 2009-0748, pp. 5-6 (La. App. 3 Cir. 12/9/09), 26 So.3d 313, 317; *State v. Myers,* 584 So.2d 242, 249-50 (La. App. 5th Cir. 1991).

In this case, the surveillance footage reflected that defendant approached the bus stop shelter after 10:00 p.m., raised both arms over his head, and swung straight downward until his momentum was halted by an object he hit at roughly the height of his knee. The crime scene photographs reveal that the victim was partially lying on the bench (with his feet nearer to the ground) inside the bus stop shelter, with his hands covering his bloody face. Det. Smith located a baseball bat inside defendant's residence on which the victim's blood was located. Additionally, autopsy photos showed the victim's skull cracked open in several different locations. Although Dr. Sandomirsky testified that the skull wounds were inflicted by multiple blows to the head, defendant's expert, Dr. Eisenstat, testified that all of the cranial wounds had been inflicted by only one blow to the victim's head but with such severe force that his skull shattered in multiple areas and sliced his scalp from the inside.

Notwithstanding defendant's trial testimony that the victim was awake, standing up, and swinging a pipe at him when he hit the victim in the head with the bat, the jury was able to view the surveillance footage, which does not appear to corroborate those claims, and was therefore entitled to reject defendant's

testimony. Further, the surveillance footage depicts that defendant swung the bat straight downward, hitting something at roughly the height of his knee, which is where the crime scene photographs depicted the location of the victim's head. As noted above, the bludgeoning in the head with a baseball bat causing fatal injury to the victim is sufficient evidence for a jury to determine that the defendant possessed the specific intent to kill or inflict great bodily harm. *See Guice,* 26,440, pp. 7-8, 645 So.2d at 1197. In this case, defendant struck the victim in the head with enough force to shatter the victim's skull and cause lacerations to his brain and scalp in three separate locations. Both Dr. Sandomirsky and Dr. Eisenstat testified that the victim's injury was fatal. Accordingly, in the light most favorable to the prosecution, a rational juror could have found that defendant possessed the specific intent to kill or inflict great bodily harm when he struck the victim in the head with the bat, fracturing his skull.

Defendant also asserts that the State failed to prove that he did not kill the victim in self-defense. "When a defendant asserts that he acted in self-defense in a homicide case, it is settled law that the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *State v. De Gruy*, 2016-0891, p. 18 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 733 (citing *State v. Jefferson*, 2004-1960, p. 10 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, 587-88). Pursuant to La. R.S. 14:18, "[t]he fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct [under certain circumstances]." A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1).

However, the defense of justification is unavailable to an offender "who is the aggressor or who brings on a difficulty…unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21; *State v. Abbott*, 2017-0016, p. 17 (La. App. 4 Cir. 6/14/17), 222 So.3d 847, 857.

Defendant argues that because the surveillance footage did not capture precisely what occurred inside the bus shelter when he struck the victim with the bat, the State could not prove that he was not defending himself from a pipe attack by the victim. However, as set forth above, a thorough review of the surveillance footage reveals a clear silhouette of defendant raising an object (determined to be a baseball bat) over his head and swinging it straight downward with enough thrust to cause him to lift his foot off the ground to regain his balance. Further, it is clear from the arc of the swing that the downward momentum of the bat was halted by an object at roughly the height of defendant's knee, which crime scene photographs suggest was the location of the victim's head as he was lying on the bench. The jury viewed the exhibits and considered the testimony and rejected defendant's claim of self-defense.

The jury also heard defendant repeatedly deny any involvement with the victim's death notwithstanding Det. Smith's continued revelations that the fatal encounter had been captured on surveillance footage and that she had already seen it. Defendant altered his recitation of events each time Det. Smith revealed the contradictions reflected in the surveillance footage. Even when defendant admitted that he hit the victim in the head, he claimed that he had used the victim's metal pipe rather than the baseball bat. Additionally, defendant fled the scene with the weapon after killing the victim, and he did not call for help or medical assistance at

any time, nor did he report the incident to the police. A rational juror could have found that defendant agreed to speak to the police a month later only because he thought the victim had been shot and wanted to convince the police of his innocence after the BOLO was released depicting defendant as the suspect.

"Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which a jury may infer guilt." *State v. Coleman*, 2012-1408, p. 10 (La. App. 4 Cir. 1/8/14), 133 So.3d 9, 19 (quoting *State v. Davies*, 350 So.2d 586, 588 (La.1977)); *See also State v. Patterson*, 2010-415, p. 14 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 149-50 ("[D]efendant's actions after the incident, including failure to report the shooting, disposal of the weapon, and flight from the scene, were inconsistent with a theory of justifiable homicide."). For the reasons discussed above, viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that defendant did not kill the victim in self-defense.

Lastly, although only tangentially related to a claim of insufficiency of the evidence, defendant asserts that the jury failed to meaningfully deliberate due to the trial dates coinciding with Mardi Gras season and the jurors' alleged concerns about parade traffic on the day deliberations were set to begin. The record reflects that deliberations lasted only three hours before the jury rendered a guilty verdict. Defendant asserts that the district court erred in failing to recess the proceeding and allowing the jury to begin deliberations the following day.

Defendant cites to his motion for a new trial which he attached as an exhibit an email purportedly sent on February 9, 2024, from an alternate juror in the case, which read:

Hi: I was an alternate juror, dismissed before deliberations. I got a call from the judge about the verdict around 6pm yesterday, and I just wanted to tell someone how outrageous I think it was that the decision about whether to sentence a man to life in prison was sent to jurors mere hours before parades kicked off. Your client didn't stand a chance.

FWIW ["For what it's worth"], I would probably have voted for negligent homicide simply because the state didn't prove specific intent. Your client clearly is no saint and has some culpability, but that video wasn't the smoking gun they built it up to be because, as you noted, we could not see what happened in the enclosure preceding the bat swing—and the victim plainly was holding something in his hand after the first altercation.

I'm really disappointed, but not sadly surprised, by the Louisiana Justice System.

This issue was addressed extensively at the hearing on defendant's motion for a new trial, during which defendant also contended that the jury did not fully deliberate due to their possible concerns about leaving in time to attend the Mardi Gras parade later that evening.

In rejecting these grounds for a new trial, the district court reasoned as follows:

[W]e did have a discussion with you and the state, in regards to the fact that this trial was set the week of parade season. At no point in time did you ever agree with the state of Louisiana to continue this case, or even suggest that the case be continued. In fact, you insisted that you wanted to move to trial. This Court took a lot of precaution with the jury. I allowed y'all to voir dire as long as you wanted to. In fact, Monday we were here till almost 9:30, 10:00 o'clock at night. So there was no concern at that point in time. Nobody at that point in time said: ["]oh this is the Monday of parade season; maybe we need to hurry up and try to pick a jury really quickly so we can start on Monday.["]

I wanted to start the trial on Monday. It didn't happen that way, so we started on Tuesday. We were very flexible with the jurors. No one had any concerns

about parade traffic or getting home. And, in fact, I'm trying to—trying to find for how long this jury was out. But they deliberated for quite some time…And it wasn't as if they came back in a—in a hurry or a rush. So—and you don't even allege that in your motion for a new trial. So, I'm not even sure why this is—why this is even being discussed."

The court minutes in the instant case reflect that the court date of February 5, 2024 was chosen on September 18, 2023; however, no transcript of that proceeding was included in the appellate record.[14] It appears defendant orally moved for a continuance on January 26, 2024, but not for the reason that the trial may be affected by Mardi Gras parades, but because defendant sought to cure his failure to serve timely notice to the State of his intent to present the expert witness testimony of Dr. Deland.

La. C.E. art. 606(B) prevents the introduction of any testimony or affidavits from a juror relating to "the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith …."[15] *See also State v. Ballard*, 2020-0617, p. 30 (La. App. 4 Cir. 7/21/21), 325 So.3d 450, 472-73. The complaining juror in this case served as an alternate juror, and was accordingly dismissed before deliberations commenced, thus she would not have been privy thereto. The substance of the complaint does not allege that any of the other jurors shared her concerns that they were sent to deliberate "mere hours

---

[14] At the hearing on motions *in limine* held on January 24, 2024, defendant indicated that on September 1, 2023, the court granted his motion to continue the September 18, 2023 trial date "to seek out Dr. Deland's consultation," and "because Dr. Deland could not do the evaluation until December or January."

[15] However, La. C.E. art. 606(B) further provides that "a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention."

before parades kicked off," nor does she contend that any jurors' vote was influenced by the timing of the deliberations. Accordingly, the complaint reveals only the opinion of an observer, and it does not allege any jury misconduct or outside influence on the jury's deliberations or its verdict. Consequently, the district court did not err in denying defendant's motion for a new trial based on the alternate juror's alleged opinion of what the evidence did, or did not prove at trial.

In any event, as set forth above, the homicide was captured on surveillance footage and contradicts defendant's trial testimony. Defendant has failed to demonstrate that the jury's verdict was based on anything other than its consideration of the evidence presented at trial, which, as discussed above, is sufficient for a rational juror to have found defendant guilty of second degree murder. This assignment of error is meritless.

***Assignment of Error Number 2***

Defendant next asserts that the district court erred in allowing Det. Smith to narrate the surveillance footage, to make conclusions, and to give opinions as to its content, as part of her trial testimony. On December 4, 2023, defendant filed a motion *in limine* to exclude hearsay and witness narration of video evidence, arguing that viewing surveillance footage was not equivalent to possessing first-hand knowledge of the events depicted thereon. At a motions hearing held on January 24, 2024, the district court granted defendant's motion in part, excluding inadmissible hearsay, but denied the remainder of the motion, stating:

> I do allow the lead detective or whoever is testifying in regards to [recorded] video, they are allowed to comment on what is observed in the video…They are allowed to testify as to what is observed in the video. If you deem something to be objectionable, then I will advise you to lodge an objection and we can deal with it at that time…Because I do believe that the witness should be

allowed to comment or testify as to the observations. If it's the defendant in the video or the victim, they should be able to say, ["]this is the defendant, this is the victim.["] People need to know what it is that they are seeing in the video.

During trial, defendant lodged objections to Det. Smith's identification of him in the surveillance video, as well as to the detective's testimony that the footage reflected a struggle between him and the victim, and that it appeared that defendant "picked something up and did like that toward his—like his foot went off the ground." [16] During a court recess, defendant lodged a general objection again in chambers, arguing that Det. Smith could only speculate about the events the surveillance footage depicted. The district court overruled defendant's objections, explaining that Det. Smith's testimony regarding "the things she observed on the video and how this has affected and helped her in her investigation in solving this case" was relevant and helpful to the jury. The district court stated further that the jury had the opportunity to view the exhibits and would "ultimately make the determination as to what they've observed on the video."

Defendant contends that because Det. Smith was not an eyewitness physically present during the homicide, and because Det. Smith was not qualified

---

[16] Defendant cites to several pages in the transcript alleging that he lodged contemporaneous objections to the narration of the surveillance footage. However, a review of the transcript reveals that several of the objections lodged did not deal with narration of surveillance video, but rather to a lack of foundation for the introduction of body camera footage (as the State was in the process of laying the foundation), and to what the crime scene photographs depicted. The only contemporaneous objections lodged on the issue at hand are set forth in the discussion above. Defendant also claims that Det. Smith testified that the victim was sleeping inside the bus stop shelter when defendant killed him, and that defendant looked over his shoulder to make sure nobody could see him, but provided no citations to the transcript to the alleged testimony. A review of Det. Smith's testimony reveals that she stated only that defendant "looked over his shoulder, looking backwards," but said nothing about the reason for so doing. Even if Det. Smith had testified as defendant claimed or similarly, there is no indication in the transcript that defendant lodged a contemporaneous objection thereto, thus the claim is not preserved for appellate review. *See* La. C.Cr.P. art. 841.

as an expert witness, her interpretation of what the surveillance footage depicted should have been excluded as hearsay.

La. C.E. art. 602 provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This Article is subject to the provisions of Article 703, relating to opinion testimony by expert witnesses.

In *State v. Williams*, 2022-0710, pp. 7 (La. App. 4 Cir. 5/15/23), 368 So.3d 179, 185, the State introduced surveillance footage taken from an RTA (Regional Transit Authority) bus that passed in front of the crime scene, and a detective identified the two people present at the scene, and "simply described what the video depicted." This Court rejected the defendant's argument that because the detective "was not an eye-witness to the crime," she lacked the personal knowledge required to testify to the events depicted in the footage, stating that the detective's "testimony demonstrated that, through her investigation, she gained adequate personal knowledge of the scene of the shooting, the events of the shooting, and the persons involved to testify to the contents of the RTA video." *Id.*, p. 8, 368 So.3d at 185.

Similarly, in *State in Interest of K.B.*, 2023-0409, pp. 30-31 (La. App. 4 Cir. 9/26/23), 372 So.3d 864, 885, *writ denied* 2023-01421 (La. 4/3/24), 382 So.3d 106, this Court held that the detective's trial testimony describing the events she observed on the surveillance footage was permissible, as she "demonstrated that, through her investigation, she gained adequate personal knowledge to testify about the video surveillance footage." This Court particularly noted that the detective "testified that she visited the scene of the carjacking; collected the video

30

surveillance footage herself; recounted what she had viewed in the footage; and explained how her investigation eventually led to identifying the perpetrators in the footage." *Id.* at p. 31, 372 So.3d at 885.

In the instant case, Det. Smith testified that she visited the scene of the crime; personally collected the surveillance footage; recounted what she viewed in the footage; and explained how she identified defendant as the perpetrator. Thus, Det. Smith demonstrated adequate personal knowledge to testify about her observations in the surveillance footage. For the above reasons, we find no merit in this assignment of error.

### *Assignment of Error Number 3*

Defendant asserts in his final claim that he was denied the right to present a defense when the district court excluded from trial Dr. Deland's expert testimony regarding his chronic alcohol abuse, and defendant asserts that his notice of intent to present the expert testimony was not untimely and should not have been denied on that basis. Specifically, defendant asserts that Dr. Deland's testimony "was necessary to [defendant's] defense of mistake of fact and self-defense." The State counters that defendant's notice of expert witness testimony did not include Dr. Deland's report and failed to put the State on timely and substantive notice of the issue to which Dr. Deland proposed to testify. The State asserts further that defendant's purported purpose in presenting Dr. Deland's expert testimony was to help the jury understand that substance abuse and chronic alcoholism impaired defendant's ability to give a statement, which was irrelevant to the elements the State had to prove at trial.

La. C.Cr.P. art. 726 provides:

A. If a defendant intends to introduce testimony relating to a mental disease, defect or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall not later than ten days prior to trial or such reasonable time as the court may permit, notify the district attorney in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other orders as may be appropriate.

B. If there is a failure to give notice as required by Subsection A of this Article, the court may exclude the testimony of any witness offered by the defendant on the issue of mental condition.

Defendant filed his initial notice to offer the expert testimony of Dr. Deland on January 12, 2024, asserting her expertise in forensic psychiatry, with a specialty in "substance use disorder and trauma," and that her testimony would be relevant. The State filed a motion to exclude evidence of mental disease or defect, seeking to exclude any testimony by Dr. Deland alleging defendant could not form the specific intent to commit the offense in this case as a result of his diminished capacity due to chronic alcohol abuse, as defendant had not asserted a plea of not guilty and not guilty by reason of insanity pursuant to La. C.Cr.P. art. 552. *See also* La. C.Cr.P. art 651 (providing that "[w]hen a defendant is tried upon a plea of 'not guilty,' evidence of insanity or mental defect at the time of the offense shall not be admissible.")

At a hearing on January 24, 2024, the State argued that without Dr. Deland's report it was unclear what Dr. Deland would testify to other than to "a diminished capacity that would not have allowed [defendant] to form specific intent," which required a plea of not guilty and not guilty by reason of insanity. Defendant replied that Dr. Deland's testimony would help the jury understand his "unique" defenses of "mistake of fact and self-defense" and assured that he would not argue at trial that diminished capacity prevented him from forming specific intent. The district

court agreed with the State, cautioning defendant that trial was less than two weeks away and that Dr. Deland's yet unknown proposed testimony would be relevant to no issue other than diminished capacity; nevertheless, "out of an abundance of fairness," the district court permitted defendant to file Dr. Deland's report "by Friday," stating, "if this is anything that goes towards diminished capacity, the Court is going to deny and not allow her to testify in this case."

On January 26, 2024, defendant filed a supplemental notice of intent to offer expert testimony, asserting that Dr. Deland specialized in "substance use disorder, chronic intoxication, and cognitive function" and stating that her testimony would be "relevant to [those] issues, [defendant's] conduct, and his statement to police." Defendant asserted further that Dr. Deland's testimony would be relevant in presenting the defense of voluntary intoxication pursuant to La. R.S. 14:15. Defendant attached Dr. Deland's report detailing her analysis, which stated that years of chronic alcohol intoxication and withdrawal could result in "memory impairment, attentional and concentration problems, difficulty focusing on a task, and tracking a line of thought." Dr. Deland's ultimate conclusion was that "[i]t is possible that [defendant] was experiencing and displaying this type of cognitive impairment during his interview with the police."

The court held another hearing on January 26, 2024, during which defendant asserted that Dr. Deland would "offer testimony on voluntary intoxication and chronic intoxication," which would be relevant to rebut the State's contention at trial that defendant "committed the murder and that he had the intent to commit murder or grave bodily injury." Defendant argued further that because the State intended to introduce his statement to police as an exhibit in its case, Dr. Deland's testimony would help the jury "understand some of his behaviors and comments in

33

that statement and perhaps why he did not use a lot of the language that the State—that the police would use in describing a self-defense claim," and also "that she can testify about voluntary intoxication as it relates to intent."

The State contended that without evidence of the level of defendant's potential intoxication at the time of the offense, Dr. Deland could not issue an opinion as to whether defendant could have formed specific intent, and that whether defendant provided his statement to police knowingly and voluntarily had been determined when the district court denied defendant's motion to suppress statement at the hearing thereon.[17] The State asserted further that Dr. Deland's report did not address the defense of voluntary intoxication but instead went "towards the suppressibility of the statement."

The district court noted that trial was ten days away and that defendant had still failed to turn over his medical records, making it impossible by that time for the State to prepare a rebuttal case "to deal with whatever it is that Dr. Deland is coming in here at the ninth hour to testify about" and agreed with the State that "the validity of [defendant's] statement" should have been determined in a motion hearing. The district court denied defendant's motion for a continuance and excluded Dr. Deland's proposed expert testimony. Defendant sought pretrial review of the ruling, and both this Court and the Supreme Court denied writs. *See State v. Collins*, 2024-0054 (La. App. 4 Cir. 2/1/24), *writ denied*, 2024-00167 (La. 2/3/24), 378 So.3d 746.

La. C.E. art. 702(A) provides:

---

[17] In fact, defendant argued at the January 20, 2023 hearing on the motion to suppress statement that defendant's intoxication at the time prevented him from knowingly and intelligently waiving his right to remain silent. The court denied defendant's motion, reasoning that it saw no evidence that defendant was intoxicated. The court continued, "[j]ust because he was nodding [off], asleep or lethargic, doesn't mean that he was intoxicated. The detective testified she did not see any signs of intoxication when she took the statement and read [defendant] his *Miranda* warnings."

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.*, at 591, 113 S.Ct. at 2795; *See also State v. Foret*, 628 So.2d 1116, 1122 (La. 1993). La. C.E. art. 401 defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While relevant evidence is generally admissible, "[e]vidence which is not relevant is not admissible." La. C.E. art. 402.

The Due Process Clause does not guarantee the right to introduce any and all evidence the defendant deems relevant because the right to present even relevant evidence is not absolute. *Montana v. Egelhoff*, 518 U.S. 37, 42-43, 116 S.Ct. 2013, 2017, 135 L.Ed.2d 361 (1996). "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under

standard rules of evidence." *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988)).

"The trial judge is vested with wide discretion in determining the relevancy of evidence, and his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion." *State v Clark*, 2023-0717, p. 10 (La. App. 4 Cir. 6/10/24), 401 So.3d 171, 178 (quoting *State v. Miles,* 402 So.2d 644, 647 (La. 1981)).

Importantly in this case, as noted above, Dr. Deland's report concluded only the possibility that defendant was suffering impairment due to chronic substance abuse during his statement to police, even without displaying "overt symptoms that are usually associated with acute alcohol intoxication." Dr. Deland did not impute to defendant any mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense of second degree murder, thus defendant's notice of intent to admit her testimony did not comport with the parameters set forth in La. C.Cr.P. art. 726. Similarly, the statutory defenses of voluntary intoxication and mistake of fact, which defendant asserted he would present at trial, are limited to negating or precluding the "specific criminal intent or special knowledge required in a particular crime," or the "presence of any mental element required in that crime." La. R.S. 14:15; 14:16.

La. R.S. 14:15 provides:

The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:

(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.

36

> (2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

La. R.S. 14:16 provides, "Unless there is a provision to the contrary in the definition of a crime, reasonable ignorance of fact or mistake of fact which precludes the presence of any mental element required in that crime is a defense to any prosecution for that crime."

Because Dr. Deland's report was absent of any conclusion that defendant's alleged chronic substance abuse rendered him incapable of forming the specific intent required to prove a second degree murder charge, it is not clear how her testimony would have been helpful in presenting the defense of voluntary intoxication or mistake of fact. Likewise, it is equally unclear how Dr. Deland's testimony would have been helpful to the jury in explaining a claim of self-defense, and defendant failed to provide any clarity or explanation thereto, either to the district court, or to this Court on appeal.

Dr. Deland's conclusion that defendant's alleged chronic substance abuse possibly impaired his attention, concentration, and ability to follow a line of thought or stay on topic during his police interview appears irrelevant to the presentation of the statutory defenses of voluntary intoxication, mistake of fact, or self-defense. Moreover, Dr. Deland did not offer an opinion in her report as to whether defendant's purported condition could have prevented him from knowingly and voluntarily waiving his right to remain silent, nor did she indicate that defendant was intoxicated at the time he provided his statement to police. Thus, it is unclear how her testimony would even be helpful in determining whether defendant's statement was constitutionally obtained.

Because Dr. Deland's purported testimony is not relevant to the defenses of voluntary intoxication, mistake of fact, or self-defense, nor entirely relevant to the issue of the admissibility of defendant's statements to police, we find the district court did not abuse its discretion in excluding Dr. Deland's testimony. Further, whether defendant's notice pursuant to La. C.Cr.P. art. 726 was "timely" is also irrelevant notwithstanding the district court's discussion thereof, as Dr. Deland's testimony ultimately did not relate to a "mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged."

Defendant has not demonstrated that the district court's exclusion of Dr. Deland's expert testimony prevented him from presenting a defense at trial, and this assignment of error is without merit.

## DECREE

In light of the testimony and evidence presented, and for the reasons stated above, we affirm defendant's conviction for second degree murder.

**AFFIRMED**